# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>The residence located at 12571 Hinton Way, Santa Ana, California 92705 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 8:22-MJ-00104 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2) | Possession of Child Pornography |
| 18 U.S.C. §§ 2252A(a)(2)(A), (b)(1) | Receipt of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Joseph P. Hamer
_____
*Applicant's signature*

Joseph P. Hamer, Special Agent (FBI)
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Santa Ana, CA</u>

Karen E. Scott, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Melissa Rabbani (714) 338-3499

**AFFIDAVIT**

I, Joseph P. Hamer, being duly sworn, declare and state as follows:

**INTRODUCTION**

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since May 1, 2016.  As a federal agent, I am empowered by United States law to conduct investigations regarding, and make arrests for, offenses enumerated in Title 18 of the United States Code. During my tenure as an SA, I have conducted and participated in numerous investigations of criminal activity, executed search and arrest warrants, and seized evidence of federal criminal violations.  Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252 and 2252A, and I am authorized by law to request a search warrant.

2.    Since April 1, 2019, I have been assigned to work violent crimes against children at the FBI's Ventura Resident Agency.  In this role, I am responsible for, among other things, enforcing federal criminal statutes involving the sexual exploitation of children.  I have received both formal and informal training from the FBI regarding computer-related investigations and computer technology.  My formal training includes 21 weeks of formal education at the FBI Academy, where

i

I took classes on writing affidavits and providing evidentiary testimony.  In support of my current assignment, I completed a four-day Internet Crimes Against Children (ICAC) training course regarding the distribution of child pornography over the Bit Torrent peer-to-peer file-sharing network.  I completed the Freenet Certification Course and have taken a follow-on training course in Freenet investigations.

3.   Prior to my assignment at the Ventura Resident Agency, I was assigned to the Los Angeles Violent Crime Task Force.  As a member of this task force, I investigated various violent crimes, including bank robbery, extortion, kidnapping, and homicide.

## PURPOSE OF AFFIDAVIT

4.   This Affidavit is submitted in support of a search warrant for 12571 Hinton Way, Santa Ana, CA 92705 (the "SUBJECT PREMISES"), more fully described in Attachment A, for the items to be seized described in Attachment B, including electronic storage devices, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2) (Possession of Child Pornography) and 18 U.S.C. §§ 2252A(a)(2)(A), (b)(1) (Receipt of Child Pornography) (the "SUBJECT OFFENSES").

5.   The statements in this Affidavit are based upon my personal observations, my training and experience, my

investigation into this case and, where noted, information obtained from various law enforcement personnel and witnesses.

6.   Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All dates set forth below are on or about the dates indicated, and all amounts or sums are approximate.

<u>**PREMISES TO BE SEARCHED**</u>

7.   The residence located at 12571 Hinton Way, Santa Ana, California 92705 is a single-family residence located on the north side of Hinton Way.  It is painted ivory and has a shake roof.  The numbers "12571" are affixed to the facade of the residence under the eaves on the south side of the residence. The numbers "12571" are affixed to a faded blue metal mailbox located at the entrance to the semi-circular driveway in front of the residence.

<u>**DEFINITIONS**</u>

8.   The following definitions apply to this Affidavit and Attachment B:

a.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do

not necessarily depict minors in sexually explicit poses or positions.

b.   The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.

c.   "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

d.   "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices,

mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

        e.   The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        f.   "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the internet service provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

        g.   "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

        h.   "Records," "documents," and "materials," as used herein, include all information recorded in any form and by any

means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

## STATEMENT OF PROBABLE CAUSE

9.    The instant investigation involves a user of "Freenet," which is an Internet-based, peer-to-peer (P2P) network that allows users to anonymously share files, chat on message boards, and access websites within the network.  Law enforcement agents have been investigating child pornography trafficking by Freenet users since at least 2011.  As set forth below, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES because at least one person has been accessing Freenet from the SUBJECT PREMISES to facilitate the SUBJECT OFFENSES.

### A.    Background Regarding Freenet

10.   To access Freenet, a user must first download the Freenet software, which is free and publicly available.  The Freenet "source code" — i.e., the computer programming code that facilitates Freenet's operation – is also publicly available. In other words, Freenet is "open source" software that may be used, examined, and analyzed by anyone with the pertinent expertise or knowledge.

11.   Anyone running the Freenet software may join and access the Freenet network.  Each computer running Freenet connects directly to other computers running Freenet, which are

called its "peers."[1]  When installing Freenet, each user agrees
to provide to the network a portion of the storage space on the
user's computer hard drive, so that files uploaded by Freenet
users can be distributed and stored across the network.  Freenet
users can upload files into the Freenet network and download
files from the Freenet network.  After a user installs Freenet
on the user's computer, the software creates a default
"download" folder.  If a user successfully downloads a
particular file from Freenet, Freenet may save the content of
that file to the "download" folder.  A user may change this
default setting and direct the content to be downloaded
elsewhere.

12.  When a user uploads a file into Freenet, the software
breaks the file into pieces (called "blocks") and encrypts each
piece.  The encrypted pieces of the file are then distributed
randomly and stored throughout the Freenet network of peers.[2]
The software also creates an index piece that contains a list of
all of the pieces of the file and a unique key – a series of

---

[1] The number of peers is determined by the user's settings
and is based on the quality and speed of the user's Internet
connection.

[2] Because the pieces of files are encrypted, a Freenet user
is unable to access the content of pieces that are stored on the
user's computer hard drive, which are not in a readable format.

letters, numbers and special characters – that is used to
download the file.[3]

13.  In order to download a file on Freenet, a user must
have the key for the file.  There are a number of ways that a
Freenet user can download a file using a key.  Some examples
include: (1) the "download" box on Freenet's "file sharing"
page; (2) the "download" box on the message board associated
with Freenet or other Freenet add-on programs; and (3) directly
through the user's web browser while the user is connected to
the Freenet network.

14.  When a user attempts to download a file via Freenet,
Freenet downloads the piece of the file containing the index,
which provides the information required to retrieve the
individual pieces of the file.  The Freenet software then
requests all of the pieces of the file from the user's peers.
Rather than request all of the file pieces from a single peer,
requests for file pieces are divided up in roughly equal amounts
among the user's peers.  If a user's peer does not have the
particular requested pieces in its storage, that peer will then
divide up and ask its peers for the pieces, and so on.  For
example, if User "A" has 10 peers and requests 1000 pieces of a

---

[3] An example key is:
CHK@0R6h6o8a~JbOGg8GmxGauRyqJPSwcHGmxGauLznw8Fey
B0go,08agxRpNx~wc~rmZRfWQaSed3HTeKKkXAwvDRF2LUaU,AAMC--
8/lolitaz49.avi.

file, roughly 100 pieces are requested from each one of User A's peers.  See Figure 1.



Freenet User A is connected to 10 peers.

User A wants to download a file that requires 1000 pieces to rebuild the file.

Because the User A has 10 peers, roughly 100 pieces are requested from each one of user A's peers.

Figure 1

If Peer "B" receives User A's request for 100 pieces of the file, but does not have any of those pieces in its storage, Peer B forwards on the request for those pieces to Peer B's peers. If Peer B has 10 peers of its own, roughly 10 pieces are requested from each one of Peer B's peers.  See Figure 2.



Peer B receives user A's request for 100 pieces of the file. Peer B does not have any of the pieces in its storage.

Peer B forwards on the request for pieces to each one of its peers.

Because B has 10 peers, roughly 10 pieces are requested from each one of B's peers.

Figure 2

As noted below, this design can help law enforcement distinguish between a Freenet user that is the original requestor of a file, and one that is merely forwarding the request of another user.

15.   To prevent requests for pieces from going on indefinitely, Freenet is configured to only allow a request for a piece of a file to be forwarded to another peer a limited number of times (the default maximum is 18). If a request reaches that limit without finding the requested piece, a signal is returned to the user's computer and the request is sent to another of the user's peers. The remaining number of times a request for a piece may be forwarded is included within the request for that piece.

16.   Freenet attempts to hide which computer uploaded a file into or downloaded a file from the network by making it

10

difficult to differentiate whether a request for a piece that comes in from a peer originated with that peer (i.e., the peer was the "original requestor" of the file), or whether that peer was simply forwarding a different peer's request.  Freenet attempts to hide the identity of the original requestor by randomizing the initial number of times a request can be forwarded from one peer to another to be either 17 or 18. Without this randomization, any time a user received a request for a piece of a file that could be forwarded 18 times, the user would know that its peer was the original requestor of the file. This design allows investigators using Freenet to focus investigative efforts on peer computers that request pieces of files of interest that may be forwarded 17 or 18 times, in order to determine whether the peer was the original requestor of the file.

17.  Freenet has two operational modes, "Darknet" and "Opennet."  On the Darknet[4] mode, a computer connects only to peers whom the user has specifically selected.  On the Opennet mode, a computer may connect to peers unknown to the user.  A Freenet user may choose which mode to use.  The mode relevant to this investigation involves a user who chose to use the Opennet operational mode.

_____

[4] Although Freenet calls this mode "Darknet," this mode does not actually use the darknet, which is a computer network with restricted access that is often used for illegal purposes.

18.   Freenet warns its users in multiple ways that it does
not guarantee anonymity: when Freenet software is initially
installed; within the log file each time Freenet is started; and
via Freenet's publicly accessible website.  Freenet software
also does not mask a computer's IP address — the IP addresses of
each Freenet user's peers are observable to the user.  For
example, if a user is connected to 10 peers on Freenet, all 10
of those peers' IP addresses will be observable to the user.
The fact that Freenet does not mask IP addresses is explained on
its publicly accessible website.  Freenet also acknowledges on
its publicly accessible website that, for users who use the
Opennet mode, it can be statistically shown that a particular
user more likely than not requested a file (as opposed to having
merely forwarded the request of another peer) based on factors
including the proportion of the pieces of a file requested by a
user and the number of nearby peers.

B.   **Child Pornography Images/Videos on "Freenet"**

19.   Freenet can be used to advertise and distribute images
and videos of child pornography.  Unlike other file sharing
systems, Freenet does not provide a search function for its
users whereby users would insert search terms to locate files.
Therefore, a user who wishes to locate and download child
pornography from Freenet must identify the key associated with a

particular child pornography file and then use that key to download the file.

20.   Freenet users can identify those keys in a number of ways.  For example, "message boards" exist on Freenet that allow users to post textual messages and engage in online discussions involving the sexual exploitation of minors.  Law enforcement agents have observed message boards labeled: "pthc," "boy porn," "hussy," "pedomom," "kidfetish," "toddler_cp," "hurtcore," and "tor-childporn."[5]  Typical posts to those message boards contain text, keys of child pornography files that can be downloaded through Freenet, and in some cases descriptions of the image or video file associated with those keys.

21.   Freenet users can also obtain keys of child pornography images or videos from websites that operate within Freenet called "Freesites."  Freesites can only be accessed through Freenet.  Some of those sites contain images of child pornography the user can view along with keys of child pornography files.  It is also possible that Freenet users may obtain keys related to child pornography images or videos directly from other Freenet users.

---

[5] These are terms known to Law Enforcement that are tags for child exploitation material.  For example, "PTHC" is short for "Pre-teen Hardcore" or "pedomom" is short for "pedophile mom" which references a type of exploitation material of incest pedophilia with an adult female perpetrator.

C. **Investigation into the Trafficking of Child**

   **Pornography on Freenet**

22.  Since approximately 2011, law enforcement has been
investigating the trafficking of child pornography on Freenet.
A modified version of the Freenet software is available to sworn
law enforcement officers to assist in conducting Freenet
investigations.  I have been trained on the operation of the
modified law enforcement version of Freenet.  This law
enforcement version is nearly identical to Freenet, except that
it allows a computer operated by a law enforcement officer to
automatically log information about requests for pieces of files
received directly from its peers.  The types of information
logged by a law enforcement computer are available to all
standard Freenet users as part of Freenet's normal operation.
This information includes, but is not limited to, the IP
addresses of the user's peers; the number of peers those peers
report to have; a unique identifier assigned by the software
(referred to as the computer's Freenet "location"); the
remaining number of times a request for a piece of a file may be
forwarded; the date/time of requests received from a peer; and
the digital hash value of a requested piece.

23.  Law enforcement computers do not target specific peers
on Freenet nor do law enforcement computers solicit requests
from any peers.  The Freenet information collected by law
enforcement computers is logged and provided to other Freenet-
trained law enforcement personnel in order to further
investigations into Freenet users believed to be downloading

14

child pornography files through Freenet.

24.  Law enforcement officers collect keys associated with suspected child pornography files that are being publicly shared and advertised on Freenet.  Law enforcement only investigates Freenet users who request pieces of files associated with such keys collected by law enforcement.  The keys collected by law enforcement have been obtained via publicly accessible sites, such as Freenet message boards and Freesites, as well as during the course of prior investigations into child pornography trafficking on Freenet.  This investigation pertains to child pornography files with known keys, the content of which are further described below.  Those files are referenced as "files of interest."

25.  By viewing the documented activity of a peer that sends a request to a law enforcement computer, it is possible to determine whether it is significantly more probable than not that the peer is the original requestor of a file of interest. Only those requests that were intended for law enforcement computers as recipients, that may be forwarded 17 or 18 times, and are associated with a file of interest are analyzed.  A mathematical formula is then applied to determine the probability of whether the number of requests received for pieces of a file is significantly more than one would expect if the peer were merely forwarding the request of another computer.

26.   I have reviewed a peer-reviewed, publicly-available academic paper describing the methodology of that mathematical formula.   In basic terms, the methodology relies on two primary facts about the Freenet software: first, the original requestor divides up its requests for pieces of a file among its peers, sending a roughly equal fraction of the requests to each peer; second, if a peer does not have the requested pieces, the peer takes the fraction of requests for pieces of a particular file and divides them up again among its own peers.   See Figures 1 and 2, included above.   Because a peer that is merely routing another peer's request would ask its peers for a significantly smaller portion of the pieces of a file than an original requester, it is possible for the recipient of requests to determine whether a request is significantly more likely than not from an original requestor.   The academic paper's detailed evaluation finds that a formal mathematical formula based on this reasoning is highly accurate (specifically, it has a high true positive rate and a low false positive rate).[6]   Based upon my training and experience, I believe this to be a reliable method to determine whether it is significantly more probable than not that a given Freenet computer is the original requestor of a file of interest.

_____

[6] The government can make that academic paper available to the Court upon request.

27.   I am also aware through my training and experience that dozens of searches of digital devices have been conducted by law enforcement officers (either through court-authorization or consent) related to targets whose IP addresses were identified based upon analysis of information from Freenet law enforcement computers, pursuant to which evidence of child pornography possession and/or trafficking was located.

        D.    **Requests Targeted in the Instant Investigation**

28.   As stated above in Paragraph 22, the law enforcement version of Freenet logs certain information about requests for pieces of files received directly from its peers and that information is shared amongst other law enforcement officers.  I reviewed information obtained and logged by law enforcement Freenet computers related to IP address 98.163.41.182.  Such information shows that a Freenet user with IP address 98.163.41.182 requested pieces of the child pornography files described below from a law enforcement Freenet computer.  With respect to each file – considering the number of requested file pieces, the total number of file pieces required to assemble the file, and the number of peers the user had – the number of requests for file pieces is significantly more than one would expect to see if the user of IP address 98.163.41.182 were merely routing the request of another user.  Accordingly – based on my review of those records, the application of the methodology described in paragraph 26, my understanding of

Freenet, my training and experience, and the fact that the same user requested pieces of multiple child pornography files – I believe that the user of IP address 98.163.41.182 was the original requestor of each of the described files.

29.   On Thursday, August 19, 2021, while reviewing data received by law enforcement Freenet computers, I observed IP address 98.163.41.182, with the Freenet Location ID 0.742882123885066, requesting blocks of suspected child pornography files. While it is not an absolute certainty the user was the original requestor, with respect to each file, considering the number of requested blocks, the total number of blocks required to assemble the file, and the number of peers the user had, the number of requests for blocks of the file is significantly more than one would expect to see if the user of IP address 98.163.41.182 were merely routing the request of another user.

30.   Between Saturday, May 1, 2021 at 10:42 AM UTC (3:42 PM PDT) and Saturday, May 1, 2021 at 11:57 AM UTC (4:57 PM UTC), a computer running Freenet software with an IP address of 98.163.41.182, with an average of 53.6 peers, requested from a law enforcement computer 73 out of 3,691 required pieces needed to assemble a file with a SHA1 digital hash value of 6JTXXOCHQPWMUS7USVKYYAKRJDC35KVM.  This file can be downloaded from Freenet using the key

CHK@lBAefz5KSaiTXd8ugTSelX1dHnAgWSjB7s8nFoE-

mhE,42fKZDVfab8hfQJxixavglx3ePrY8k8~AVeW~0P66Lc,AAMC--

8/10yo%20Preteen%20Girl%20With%20Her%20Doll%20%26%20Uncle%20%28C

um%20In%20Face%20-%202017m17s%29.AVI.

    a.   I have downloaded the file with the above referenced SHA1 hash value from Freenet. The file is titled "12yo Preteen Girl With Her Doll & Uncle (Cum In Face – 17m17s).avi" and is an approximately 17 minute and 17 second video that depicts a minor female who appears to be under the age of 12 sitting on a couch reading a magazine with her legs spread apart. She is wearing a shirt and underwear under a denim skirt. The skirt is pulled up to her hips. She manually stimulates herself under her underwear. She takes off her underwear. The focus of the camera is on her vagina as she manually stimulates herself. She then puts a doll's face on her vagina while she lies on her back. She then lies the doll on its back and sits on the doll's face. An adult male wearing a black shirt orally copulates the minor female while she sits on the couch. He then lies on his back on the couch and the minor female sits on his chest while he orally copulates her. They engage in a "69" position and orally copulate each other. He is seen kneeling on the couch next to her while she orally copulates him. She is then seen lying on her back while she orally copulates him. He then ejaculates on her mouth and chin.

    31.  Between Saturday, May 15, 2021 at 9:25 AM UTC (2:25 AM PDT) and Saturday, May 19, 2021 at 10:14 AM UTC (3:14 AM PDT), a

computer running Freenet software with an IP address of
98.163.41.182, with an average of 54.7 peers, requested from a
law enforcement computer 20 out of 831 required pieces needed to
assemble a file with a SHA1 digital hash value of
SMTCFONWLZTDBYXKUG55Y74DQ7HX57E4. This file can be downloaded
from Freenet using the key CHK@W--
Y4IhJB67~r8xUBxnIW1KScsY527p1d09O5Lkc-5c,V4Wjn-
oofo1fZNZbqKngYQ2m8OH05FPYM7XfCe1EbOE,AAMC--
8/12Yo%20Girl%20Fuck%20%282%29%2021.10.2019%2012-26.mp4.

    a.   I have downloaded this file with the above
referenced SHA1 hash value from Freenet.  The file is titled
"12Yo Girl Fuck (2) 21.10.2019 12-26.mp4" and is a four minute
one second video that depicts a minor Asian female wearing a
blue top and no underwear being vaginally penetrated by an adult
male.  The focus of the camera is on her vagina as she is being
vaginally penetrated.

    32.  Between Saturday, May 29, 2021 at 2:18 PM UTC (7:18 PM
PDT) and Saturday, May 29, 2021 at 4:01 PM UTC (9:01 PM PDT), a
computer running Freenet software with an IP address of
98.163.41.182, with an average of 62.7 peers, requested from a
law enforcement computer 123 out of 7,182 required pieces needed
to assemble a file with a SHA1 hash value of
TURCOIMUETU4FFWSACMSCFDK5BHMXB2G.  This file can be downloaded
from Freenet using the key CHK@BcFekKTJ3-

shpgrrP14x8r27W4tyCXYEqmY63p559jw,ghdsqDfdx-

0KFdGd~eQEMhKMUZ6W1oBYYLz7rccdMmI,AAMC--8/

Dad%20Rents%20His%2012yo%20Daughter%20To%20Man%20For%20Sex.mp4.

      a.   I have downloaded this file with the above
referenced SHA1 hash value from Freenet.  The file is titled
"Dad Rents His 12yo Daughter To Man For Sex.mp4" and is an
approximately 34 minute and 19 second video that depicts a nude
minor female who appears to be under the age of 12 on a bed with
a nude adult male.  She lies on her back with her legs spread
apart.  The adult male manually stimulates her and spreads the
labia, exposing her vagina.  He digitally penetrates her and
orally copulates her. The focus of the camera is on her vagina.
He then vaginally penetrates her with his penis.  In the middle
of the video, he lies on his back and the nude minor female sits
on him and is vaginally or anally penetrated.

    33.  The fact that a Freenet user requested pieces
associated with a particular file on Freenet indicates that the
user attempted to download the file's contents from Freenet.  It
does not indicate whether or not the user successfully retrieved
all of the necessary pieces to successfully download the file.

    34.  The keys for each of these files were obtained by law
enforcement agents at some point between 2011 and the present
date either from a Freenet message board or Freesite that
contained information related to the sexual exploitation of

children, or from a previous investigation.  I am not aware of
how, or from where, this particular Freenet user obtained a key
in order to attempt to retrieve the files of interest described.

**E.   Identification of the SUBJECT PREMISES**

35.   On Thursday, August 19, 2021, a check on the IP
address 98.163.41.182 was conducted through Maxmind's publicly
available database of IP addresses. Maxmind indicated that the
IP address is provided by Cox Communications and is believed to
be used in the Irvine, California area.

36.   According to records dated October 4, 2021, and
received pursuant to an administrative subpoena to Cox
Communications, IP address 98.163.41.182 (Port 61612) was used
by subscriber J F BENSON at 12571 Hinton Way, Santa Ana,
California, 92705-1499, telephone numbers (714) 538-7049 and
(714) 296-3060, starting 5/01/2021, at 10:42 AM UTC, and ending
on 5/29/2021, at 16:01 PM UTC, which covers the entire period of
activity described above.  The account was listed as "active,"
and services subscribed to were cable and high speed data
services.

37.   A search of multiple public records databases that
provide names, dates of birth, addresses, associates, telephone
numbers, email addresses, etc., including Accurint and CLEAR,
was conducted for both J F BENSON and 12571 Hinton Way, Santa
Ana, California, 92705 ("SUBJECT PREMISES").  These public

records indicated that SUBJECT PREMISES was the current address for JAMES FRANCIS BENSON, BARBARA JOAN BENSON, and MICHAEL HENRY BENSON.

38.   A check with the California Department of Motor Vehicles revealed that BARBARA JOAN BENSON and MICHAEL HENRY BENSON both hold an active California driver's license with the SUBJECT PREMISES listed as their residence.  A California driver's license held by JAMES FRANCIS BENSON with the SUBJECT PREMISES listed as his residence expired in January 2020. MICHAEL HENRY BENSON is the registered owner of a 1996 Chevrolet Camaro bearing California license plate number 3SRT899 and a 2015 Ford Fusion bearing California license plate number 7KSR991 at the SUBJECT PREMISES.

39.   On or about January 24, 2022, United States Postal Inspection Services (USPIS) received information from the delivering United States postal facility that JAMES BENSON, BARBARA BENSON, and MICHAEL BENSON received mail at the SUBJECT PREMISES on January 19, 2022.

**BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET**

40.   I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

          a.   Computers and digital technology are the primary way in which individuals interested in child pornography

interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.   Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.   A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child

pornography.  Electronic storage media of various types – to
include computer hard drives, external hard drives, CDs, DVDs,
and "thumb," "jump," or "flash" drives, which are very small
devices which are plugged into a port on the computer – can
store thousands of images or videos at very high resolution.
It is extremely easy for an individual to take a photo or a
video with a digital camera or camera-bearing smartphone, upload
that photo or video to a computer, and then copy it (or any
other files on the computer) to any one of those media storage
devices.  Some media storage devices can easily be concealed
and carried on an individual's person.  Smartphones and/or
mobile phones are also often carried on an individual's person.

          e.   The Internet affords individuals several
different venues for obtaining, viewing, and trading child
pornography in a relatively secure and anonymous fashion.

          f.   Individuals also use online resources to retrieve
and store child pornography.  Some online services allow a user
to set up an account with a remote computing service that may
provide e-mail services and/or electronic storage of computer
files in any variety of formats.  A user can set up an online
storage account (sometimes referred to as "cloud" storage) from
any computer or smartphone with access to the Internet.  Even in
cases where online storage is used, however, evidence of child

pornography can be found on the user's computer, smartphone or external media in most cases.

g.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files).  Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

### TRAINING & EXPERIENCE ON DIGITAL DEVICES[7]

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

42.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

42.   Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

b.   Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such

correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  These individuals often maintain possession of these items for long periods of time.

43.   Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

44.   Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on his person.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child

pornography is recoverable after long periods of time, searching the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

## REQUEST FOR SEALING OF APPLICATION/AFFIDAVIT

45.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant affidavit.  I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving minor victims and as far as I am aware, the targets of this investigation remain unaware that they are being investigated.  Disclosure of the search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Further, based upon my training and experience, I have learned that online criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness

## CONCLUSION

46.  Based on the foregoing, there is probable cause to believe that evidence, fruits and instrumentalities of the

SUBJECT OFFENSES, more fully described in Attachment B, are located at the locations described in Attachment A.  I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.


_____
Joseph P. Hamer, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 28th day of January, 2022.


_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

**PROPERTY TO BE SEARCHED**

The residence located at 12571 Hinton Way, Santa Ana, California 92705 is a single-family residence located on the north side of Hinton Way.  It is painted ivory and has a shake roof.  The numbers "12571" are affixed to the facade of the residence under the eaves on the south side of the residence. The numbers "12571" are affixed to a faded blue metal mailbox located at the entrance to the semi-circular driveway in front of the residence.



## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography) specifically:

a.   Child pornography, as defined in 18, U.S.C. § 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to peer-to-peer file sharing software.

g.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

iii

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

j.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

k.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

          iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.   records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and
drives intended for removable media; related communications
devices, such as modems, routers, cables, and connections;
storage media, such as hard disk drives, floppy disks, memory
cards, optical disks, and magnetic tapes used to store digital
data (excluding analog tapes such as VHS); and security
devices.

II.     **SEARCH PROCEDURE FOR DIGITAL DEVICES**

     4.  In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search
warrant will employ the following procedure:

          a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items

to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.  This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7. During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor

x

of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.